Filed 12/1/21  In re J.R. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B308139<br><br>(Los Angeles County Super. Ct. Nos. 19CCJP04187, 19CCJP04187A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.R.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of

Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel for Plaintiff and Respondent.

_____

This is the third appeal arising out of the juvenile court's jurisdiction over J., the eight-year-old child of mother, M.R., and father, J.R.  In the first appeal, father challenged the court's jurisdictional and dispositional orders establishing jurisdiction over J. pursuant to Welfare and Institutions Code section 300, based on mother and father's conduct in repeatedly accusing each other of abusing J.[1]  We dismissed the appeal, finding that the court would maintain jurisdiction over J. regardless of the outcome of the appeal and father's dispositional challenge was rendered moot by subsequent rulings.

Following another incident in which mother accused father of harming J., the court sustained a section 387 supplemental petition and removed J. from both parents' custody.  Mother appealed, arguing that there was insufficient evidence to support the court's findings of jurisdiction over J. and that J.'s removal from parental custody was unnecessary to prevent substantial danger to him.  We affirmed.

Father now appeals from the same orders sustaining the section 387 supplemental petition and removing J.  Once again, we affirm.

## BACKGROUND

A detailed recitation of facts is contained in our prior unpublished opinions, *In re J.R.* (Nov. 2, 2020, No. B299814)

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

(nonpub. opn.) (*J.R. I*) and *In re J.R.* (July 22, 2021, No. B307228) (nonpub. opn.) (*J.R. II*). We recite here only a brief summary relevant to the issues on appeal.

### *Original Petition, Jurisdiction, and Disposition*

Mother and father have one child together, J., born in 2013.[2] In January 2017, upon annulment of their marriage, the family court awarded mother primary physical custody of J., with visitation for father.

On June 28, 2019, the case was referred to the Los Angeles County Department of Children and Family Services (DCFS) based on father's report of abuse by mother. When the babysitter dropped J. off for father's visitation, father noticed that J. had several fresh scratch marks and bruises.

J. told a DCFS children's social worker (CSW) that mother hit and scratched him when she was upset. At the time, J. had numerous fresh, deep red scratches on his face, neck, back, and arm, and bruises on his eye and thigh. Father told the CSW that he had made several prior reports about mother's physical abuse and neglect of J. He stated that he did not communicate with mother, because "all she does is argue."

Mother reported that J.'s injuries were caused by her babysitter's 10-year-old autistic son, who lashed out at J. while the babysitter was transporting both children. Mother stated that since their separation, father had made multiple reports to DCFS alleging that she had abused the child, but that J. had attention-deficit/hyperactivity disorder (ADHD) and sometimes sustained scratches and bruises from rough playing. Mother also stated that J. returned from visiting father with bruises and that father refused to communicate with her directly.

---

[2] Mother is not a party to this appeal.

3

DCFS noted a pattern of ongoing physical abuse referrals by both parents against each other, including nine DCFS investigations for physical abuse and neglect between 2016 and 2018. Most of the incidents involved scratching or bruising, and many included visits to the hospital for evaluation. The referrals were ultimately closed, with most being found inconclusive.

DCFS filed a dependency petition on July 2, 2019 under section 300, subdivisions (a) and (b)(1). Counts a-1 and b-1 alleged that mother had physically abused J. Count b-2 alleged that on a prior occasion, mother endangered J. by driving under the influence of alcohol while J. was in the vehicle. J. was detained from both parents and placed in shelter care.

In subsequent interviews with DCFS, J. denied being hit by mother or father and stated that the babysitter's son scratched and hit him. The babysitter confirmed that her son had scratched J. repeatedly on June 28, 2019. Both father and mother reported concerns with J.'s safety when he was with the other parent. Father told DCFS that J. told him that mother hit him, which mother denied.

DCFS noted J.'s inconsistent statements regarding his injuries, and suggested that J.'s "high energy and activity due to his diagnosis of ADHD" was a possible contributing factor for his injuries. DCFS concluded that the babysitter's son caused the injuries J. sustained on June 28, 2019. DCFS therefore recommended that the court dismiss all three counts (a-1, b-1, and b-2) from the petition.

However, DCFS indicated it intended to amend the petition to include a count of emotional abuse against father and mother, stating that in multiple prior referral investigations, father and

mother "recycled prior allegations of abuse and neglect against each other to gain leverage regarding J[.]'s custody," and "list[ed] significant concerns about each other to sabotage and demonize the other parent." DCFS concluded that "due to the parents' strained history and current custody issues, it appears that the parents have chosen to place [J.] in the middle of their feud, and firmly ignore each other unless they are accusing each other of abusing and neglecting" J.

DCFS filed a first amended petition on July 23, 2019, adding allegations under section 300, subdivisions (b)(1) and (c). As amended, counts b-3 and c-1 alleged that mother and father "created a detrimental home environment" for J. by "accusing each other of abusing and neglecting" J. and reporting such abuse and neglect to law enforcement and child protection services "for the purpose of gaining and/or maintaining custody" of J. DCFS noted an incident in which father accused mother of neglecting J. while J. was present and mother yelled at J. to stop lying. The petition further alleged that J. showed behaviors indicating emotional distress, including hitting peers and destroying his own property, and that mother and father's conduct placed J. "at substantial risk of suffering serious emotional damage and physical harm."

At the adjudication and disposition hearing on July 24, 2019, the court dismissed counts a-1, b-1, b-2, and c-1. As to the remaining count, b-3, the court found "substantial evidence of a pattern of conduct by both parents" accusing each other of causing injuries to J., "the overall result [of which] has been to hurt their child." The court continued, "If someone is going to accuse someone of physical abuse every time a six-year-old boy has a bruise, this child is going to have so many interactions with

5

police and social workers that in and of itself is going to harm the child. . . . [T]here just seems to be a lot of reaction to things that are kind of normal during childhood being weaponized against each other, and it has to stop." The court further noted that seeing his parents fighting over him could "cause very serious emotional harm" to J., and "although the child may have some learning problems, children act out their distress. And some of the things the child has said to have done, hitting other people, destroying his own stuff, . . . that would suggest that the child is feeling some emotional turmoil and kind of acting it out through his behavior" and "tend[s] to show that the child is being affected by all of this conflict that is going on over him." The court concluded that DCFS had not established emotional abuse, but rather "a pattern of behavior that creates a risk of emotional harm to the child," which, in turn, created a risk of physical harm to J.

Accordingly, the court declared J. a dependent and sustained the amended count b-3, finding father's and mother's conduct placed J. at risk of suffering serious emotional damage and physical harm. The court released J. to the home of both parents, with primary custody to mother and unmonitored, weekend visitation for father.

### First appeal

Father appealed from the court's jurisdictional and dispositional findings. In *J.R. I,* we dismissed father's appeal, declining to reach the merits of the court's jurisdictional findings because mother's failure to appeal meant that the court would retain jurisdiction over J. regardless of the outcome of father's appeal. Additionally, father conceded that his challenge to the dispositional order was rendered moot based on subsequent

6

proceedings.  (See *J.R. I, supra*, B299814.)

***Section 342 subsequent petition***

In a last minute information filed on August 20, 2019, DCFS reported that J. had participated in a forensic interview on August 5.  The evaluator reported that J. had a "speech delay" that made it difficult for the evaluator to understand him; J. also seemed to have difficulty understanding the evaluator and "great difficulty focusing."  When asked about how he got the bruises on his face, J. first said he forgot, then said that the babysitter's son "smacked" him.

DCFS filed a status review report on December 31, 2019.  It reported that father cancelled multiple visits with J. from October to December 2019.  J. also stated that when he visited, father was working and never home.  In a visit on December 21, 2019, the CSW heard J. asking father to call mother because he wanted to go home.  DCFS recommended continued family maintenance services for mother and father, noting that both parents had demonstrated positive changes, but made "little progress" with their case plans. Father was participating in individual therapy but was not enrolled in parenting classes.  DCFS assessed both parents as a "moderate" risk of future abuse and neglect.  Both parents expressed a desire to co-parent in a peaceful manner.  J. stated that he liked living with mother and visiting father.

On January 24, 2020, mother called DCFS to report physical abuse by father.  According to mother, on January 23, 2020, father took J. to the bathroom while the family was at the courthouse for a status review hearing.  Later that afternoon, J. told mother that while in the bathroom, father purposely scratched J. on his back, resulting in two visible scratches, each

7

several inches long.  Mother also brought J. to the police station on January 24, 2020 making the same allegations.  The police officers expressed concern that the marks on J.'s back did not appear to be scratches as mother reported, but rather bruises, and that given the family's extensive history, mother and father continued to blame one another and "it is unknown which if not both parents are inflicting injuries on the child."

The CSW assessed J. and reported that he had two "linear purple and green color marks" on his lower back, which did not appear to be scratches. J. told the CSW that father took him to the bathroom and scratched him with two fingers.  When asked why father scratched him, J. responded, "because he wants my mom to get in trouble." J. stated he did not tell mother until they left the courthouse because he did not want to see his parents arguing.  He also said he did not want "to go with daddy anymore because he's mean."  When asked if mother told him to tell DCFS anything, J. said, "tell the worker your daddy did it. Because my dad wants my mom to go to jail because he wants me all day."  He denied that mother hurt him in any way, but said that father "smacks me everywhere."  Father did not respond to multiple voicemail and text messages left by CSWs and investigating police officers on January 24.

Given the conflicting information regarding J.'s injuries, DCFS arranged for a forensic examination.  The forensic examination concluded that the marks were consistent with scratches, but more likely were caused by an object rather than fingernails.

DCFS interviewed father on January 29, 2020.  Father denied scratching J. and said that mother manipulated J. to report that father hit him.  Father blamed mother for the marks

and said that he wanted DCFS to remove J. from both parents so that J. would not continue to be physically abused by mother.

In the detention report, DCFS concluded that the marks were not consistent with the explanation given by mother and J., as they did not appear to have been made by fingernails, and appeared to be more than a day old. DCFS also reported that, based on J.'s statements, "it appears that the child has been coached." DCFS noted that it appeared neither parent had benefitted from court services, as J. "continues to be re-abused, while left with marks and bruises and explanations for such marks and bruises do not coincide with the coloration and size of the marks."

DCFS filed a subsequent petition on February 4, 2020 under section 342,[3] alleging that J. sustained a bruise on his back, which was "not consistent with explanations of the manner in which the child sustained the injuries," and "would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts" by the parents. At the detention hearing on February 5, 2020, the court removed J. from the custody of his parents and ordered him placed into shelter care. The court further ordered monitored visitation for both parents.

### Section 387 supplemental petition

DCFS filed a supplemental petition under section 387[4] on

---

[3] In a subsequent petition under section 342, DCFS "alleges new facts or circumstances, other than those under which the original petition was sustained, sufficient to state that the minor is a person described in Section 300."

[4] Under section 387, DCFS may file a supplemental petition seeking an order "changing or modifying a previous order by removing a child from the physical custody of a parent," upon a showing that "the previous disposition has not been effective in

9

February 26, 2020.  The petition added count s-1, alleging that the previous disposition was not effective in protecting J., as mother and father "continued to establish a detrimental and endangering home environment" for J. by continuing to accuse each other of abuse and neglect, including blaming each other for the latest marks found on J.'s back.  The petition further alleged that "[r]emedial services failed to resolve the family problems" and that the parents' conduct endangered J.'s physical and emotional health and safety.

DCFS filed a jurisdiction/disposition report on February 27, 2020.  J. spoke with a CSW at his foster placement on February 14.  The CSW reported that J. was "cooperative and friendly," free of marks and bruises, and was able to identify the difference between telling truth and a lie.  J. stated that he was living with the foster family because father scratched him on his back while they were in the bathroom.  J. said he did not know why father scratched him, father did not say anything at the time, and J. did not feel it happen and did not cry.  J. also said that when mother saw the scratches, she told J. that "they were going to take me away from her and my dad," and that father had scratched J. "because he wants my mom to go to jail."  Mother told DCFS that during her relationship with father, he was "very abusive both verbally and physically."  She claimed that she and father had been "having problems ever since" their separation, but denied that she had ever hurt J.  She also said that father was inconsistent with visits and that J. "doesn't want to go with him."

DCFS spoke with father on February 12.  He reported that mother used to hit J. "with shoes and with her hands" and "has always been aggressive towards" the child.  Father stated that he

the rehabilitation or protection of the child."

10

would never hurt J. He also stated that during the initial case in 2019, mother had "[s]omehow . . . convinced DCFS that she did not hurt [J.] and that some kid caused his injuries."

DCFS spoke with J.'s foster mother, who also cared for J. during his prior detention in June 2019. The foster mother reported that J. had started to "pound on his legs when frustrated," which he had not done before. Additionally, she told the CSW her concern that mother called J. "all day," disrupting his routine and upsetting him. DCFS also noted that J. had been diagnosed with ADHD and it had been recommended that he also be evaluated for autism.

DCFS concluded it was unlikely that father deliberately injured J. "in a public setting minutes prior to a court hearing." DCFS's report also noted that the marks did not seem to be fingernail scratches, and did not appear fresh, as mother and J. had claimed. DCFS stated it could not determine who caused the marks on J.'s back or when they occurred. DCFS therefore recommended that the section 342 petition be dismissed. With respect to the remaining count s-1 of the section 387 supplemental petition, DCFS noted that J. was "in the middle of a custody battle between the parents and as a consequence appears to be confused as to his feelings and what is going on between his parents." DCFS cited J.'s conflicting statements that father was mean to him and that father was never mean, and J.'s report that mother told him that father only loved father's girlfriend. DCFS concluded that the parents "have not benefitted from any services and continue to blame one another for causing harm to the child," and that it was "clear that the child continues to be manipulated and his emotional wellbeing is being jeopardized by his parents."

11

In a May 2020 report, DCFS opined that "[a]t this time, it is not appropriate to return" J. to mother or father. DCFS noted that father had "demonstrated some positive changes" and had "demonstrated a commitment to caring for J[.] and participating in Court ordered services." However, "[d]espite some positive changes, there has been little progress made with Father's case plan in relation to peaceful co-parenting. Although [father] has made some progress it appears that he continues to have difficulty co-parenting in a peaceful manner" with mother. DCFS made the same conclusions regarding mother and stated that both parents "would benefit from continuing to participate in services." DCFS assessed J. at "high risk" of future abuse and neglect from mother and father.

DCFS filed a last minute information on May 8, 2020. Due to the pandemic, visitation between J. and his parents was conducted remotely starting in March 2020. Father participated in monitored telephone visits with J. DCFS filed an additional last minute information on August 7, 2020. J.'s foster mother observed that during father's remote visits, he did not speak to J., but "stared at the phone for 30 minutes." She stated that the interaction was "strange" and J. asked for the video call "to end almost immediately as the father did not engage with him." She acknowledged that there was a language difficulty, as father primarily spoke Spanish, but noted that father's girlfriend speaks English and participated in the video calls, but also failed to engage with J. The foster mother stated that she tried to intervene and prompt J. to tell father about his activities, but father did not reciprocate, and the visits went from lasting 30 minutes to ending after only a few minutes. She also reported

12

that during mother's virtual visits, mother would often make J. show her his body so that mother could inspect it for marks and bruises. According to the foster mother, J. would have panic attacks and start crying uncontrollably if he had a scratch on his body, saying "I can't have a mark! That means I'm going to be here forever!" She also overheard J. stating that "they say my dad leaves marks on me, but I did it to myself."

Mother and father resumed in-person visitation in June 2020. J.'s foster mother stated that she was not acting as the monitor for J.'s in-person visits with father, but she stayed long enough to observe their initial interaction and that father did not "greet the child or acknowledge the child at all."

At the adjudication and disposition hearing on August 20, 2020, the court dismissed the section 342 petition at the request of DCFS. Turning to the section 387 supplemental petition, both counsel for DCFS and J.'s counsel urged the court to sustain the petition. Mother's counsel acknowledged that there was a "bitter high-tension relationship" between mother and father and that J. was "understandably confused by family dynamics." But mother's counsel argued that "being merely upset or confused is not really jurisdictional. There needs to be something more, something that would lead to this child experiencing long term harm." Father's counsel argued for dismissal of the petition as to father, arguing that mother was harming J.'s emotional wellbeing and "whatever conflict is going on between the parents . . . it does not require removal from the father."

The court noted that it was "an unusual situation where the case originally came in as a physical abuse case," but DCFS's current position was that "the conflict between the parents is so severe that the only way to protect the child is to remove him

13

from both of his parents." The court stated it was looking at jurisdiction and disposition together, and found that DCFS had met its burden "even by clear and convincing evidence as to mother," because despite completing her case plan, mother "seems to have a complete lack of insight about how her behavior is harmful to the child." The court explained that "the case is really about emotional harm to the child caused by essentially the child being used as a weapon in a conflict between the parents. And the fact that mother persists in that exact behavior really shows a lack of insight as to how she is harming her child by continuing to search for evidence that the father has abused him."

The court suggested that removal from father based on his actions was a closer question, noting that father had a pattern in the past of accusing mother of physically abusing J., but that father "hasn't done that recently." The court asked DCFS to respond regarding "why the department thinks that [father] is equally responsible for the emotional harm to the child or that . . . the child also has to be removed from him to protect the child from serious emotional harm." Counsel for DCFS responded that she understood "what the court is saying regarding father at this moment does not appear to be accusing mother of any physical abuse or harm, which he had in the past," but cited the August 20 last minute information as "representative of what some of the issues are" regarding father and J. and the impact on J.'s "mental health and wellbeing." She cited the statements by J.'s foster mother that during father's visitation he "did not interact with J[.] at all on visits. He stares at the phone. He does not speak to the child. It's unclear...why he's refusing to engage with his child." She argued that father's conduct impacted J.'s mental

14

health and added to the situation "that the parents have created with their relationship between each other and what they are putting on the child. . . . With regards to . . . father accusing mother, I think he's not doing that right now. He is sort of just saying he didn't do what mother accused him of doing. He doesn't have anything good to say about mother, but it's not clear that he stated anything to J[.] about her at all." DCFS noted it would not oppose the court amending the petition to conform to proof, but it believed it had met its burden. J.'s counsel echoed these arguments.

The court noted that the "good news is that the court has considered and rejected allegations that the child is actually being physically abused by anybody," and that "the heart of the case was this ongoing conflict between the parents." The court further found that "even though father hasn't engaged in this type of behavior recently, I think that county counsel and minor's counsel are correct that the child is still suffering the effects of the father as well as the mother using the child as a weapon to attack the other parent. The father—his lack of engagement during visits is really disturbing. It doesn't seem like the father is doing anything to try to create a healthy and positive relationship with the child." The court concluded that it "would be unsafe to release the child to either parent because it appears that the parents are still so tangled up in their conflict with each other that neither of them is engaging with the child in a healthy manner." The court also found a risk of physical harm to J., noting that J. said that father was accused of leaving marks on him but that J. reported that "I did it to myself," and finding a "history of this child self harming due to emotional distress, and that does seem to be still happening." The court acknowledged

15

that removal was "a drastic outcome, but I just don't see any other way to stop the child from being torn apart by these parents. Doing programs is one thing, but the point of doing programs is to actually change your behavior." The court cited mother's behavior in checking J.'s body for marks and father's "sort of estranged detachment to the child," and concluded that "removal is the only way to avoid harm."

Accordingly, the court sustained count s-1 as to both mother and father, finding that the prior disposition was not effective in protecting J. The court also found removal from mother and father was necessary and ordered monitored visitation for both parents.

Mother and father separately appealed from the August 20, 2020 order.

### Mother's appeal

In her appeal, mother argued that the court lacked substantial evidence to sustain the section 387 petition. We rejected this claim, finding that substantial evidence supported the trial court's conclusion that the prior disposition returning J. to mother's care was ineffective in protecting the child. We noted that in the months following the initial disposition and adjudication, despite her participation in services, mother demonstrated little improvement in her ability to co-parent with father and minimal insight into the harm such conflict could cause to J. We also concluded that substantial evidence supported the trial court's finding that there was a risk of harm to J. absent removal. (See *J.R. II, supra*, B307228.)

### Subsequent hearing

We granted respondent's request to take judicial notice of the minute order from a review hearing held on February 24,

16

2021. The court found that mother had made "substantial" progress "toward alleviating or mitigating the causes necessitating placement," and therefore that releasing J. to mother would not create a substantial risk of detriment to J.'s safety, protection, or physical or emotional well-being. The court ordered J. to be placed with mother, with monitored visitation and enhancement services for father.

## DISCUSSION

Father appeals from the court's order sustaining the section 387 petition and removing J. from his custody. We find no error and therefore affirm.

### I. *Legal Standards*

DCFS may file a section 387 supplemental petition when the juvenile court has already assumed jurisdiction over a minor but DCFS alleges that the previous disposition has not been effective in protecting the child. Thus, a "section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161, citing § 387; Cal. Rules of Court, rule 5.560(c).) "In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child. [Citations.] If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate." (*In re T.W., supra,* 214 Cal.App.4th at p. 1161, citing § 387, subd. (b); see also Cal. Rules of Court, rules 5.565(e)(1) and (e)(2); *In re H.G.* (2006) 146 Cal.App.4th 1, 11.)

"A section 387 petition need not allege any new

17

jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists." (*In re T.W., supra,* 214 Cal.App.4th at p. 1161; see also *In re Joel H.* (1993) 19 Cal.App.4th 1185, 1200 ["The law does not require that a fact necessary to establish jurisdiction under section 300 be established to warrant a change in placement"].) The only "jurisdictional fact" necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child. (§ 387, subd. (b); *In re Joel H., supra,* 19 Cal.App.4th at p. 1200; see also *In re T.W., supra,* 214 Cal.App.4th at p. 1161.)

We review challenges to the court's findings on a section 387 petition for substantial evidence. (See *In re T.W., supra,* 214 Cal.App.4th at p. 1161; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) ""In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].""" (*In re I.J.* (2013) 56 Cal.4th 766, 773; see also *In re T.W., supra,* 214 Cal.App.4th at pp. 1161-1162.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. (*In re E.E.*

(2020) 49 Cal.App.5th 195, 206; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## II.  *Jurisdiction*

DCFS filed its section 387 petition in February 2020, alleging that mother and father continued to establish a detrimental and endangering home environment for J. by continuing to accuse each other of abuse and neglect, including blaming each other for the latest marks found on J.'s back.  The petition further alleged that [r]emedial services failed to resolve the family problems and that the parents' conduct endangered J.'s physical and emotional health and safety.  Father contends that the juvenile court found that Father had neither physically abused his son, nor made any accusations about Mother to him, as the petition alleged.  Thus, he argues that the court erred in finding the allegations of the section 387 petition true and sustaining the petition as a result.

We are not persuaded.  While it is undisputed that the court concluded that the latest injuries to J. were unlikely to have been intentionally caused by father, the court remained concerned that J. continued to sustain injuries, possibly due to self-harming.  As the court had previously found, mother and father's pattern of accusing each other of abuse could "cause very serious emotional harm" to J., and J.'s behavior indicated that he was acting out his distress over the conflict.  This behavior had not resolved in the months following the court's assumption of jurisdiction.  Further, despite progress with his court-ordered programs, father continued to blame mother, suggesting that mother had previously injured J. but "convinced" DCFS and the court otherwise.  Father further stated that he would rather have J. in foster care than have him live with mother.  Although the

19

court noted that father's accusations against mother had decreased, the evidence supported the conclusion that both parents continued to blame each other, creating circumstances where neither DCFS nor the court could determine what was causing J.'s injuries and causing continued emotional distress and confusion for J.

Father also contends that the court sustained the petition based solely on evidence of "[a]wkward video visitation during the pandemic, between a diagnosed hyperactive and possibly autistic 6-year-old and his Spanish-speaking father." He argues that this evidence is insufficient to establish that the previous disposition was ineffective in protecting the child. We disagree with father's characterization of the record. The court relied on the full constellation of facts regarding the long history of allegations between father and mother, as well as its findings regarding J.'s emotional distress and risk of further harm, which had not abated despite months of services. Moreover, although father minimizes the issues with his recent virtual visits, the court found father's behavior deeply concerning and indicative of a continued willingness to put J. in the middle of the conflict between father and mother. Father argues that his conduct was due to difficulties with language and with J.'s hyperactivity. But J.'s foster mother reported that father failed to even attempt to engage with J. during the visits, despite her attempts to facilitate conversation, and despite the presence of father's English-speaking girlfriend. As a result, J. sought to reduce the time of the visits to just a few minutes at a time. Notably, there was no evidence that J.'s ADHD caused similar difficulties in his virtual visits with mother. J.'s foster mother also testified that father's refusal to engage with J. continued once in-person visits

resumed, based upon her observations while dropping J. off. Under these circumstances, substantial evidence supported the trial court's conclusion that the prior disposition was ineffective in protecting J.

### III.   *Removal*

Father makes similar arguments in challenging the court's finding that removal was necessary.  When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361.  (*In re T.W., supra,* 214 Cal.App.4th at p. 1163; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1001–1003.)  Before a minor can be removed from the parent's custody, the court must find, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re Javier G.* (2006) 137 Cal.App.4th 453, 462.)

"A removal order is proper if it is based on proof of: (1) parental inability to provide proper care for the minor; and (2) potential detriment to the minor if he or she remains with the parent.  [Citation.]  The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child."  (*In re T.W., supra*, 214 Cal.App.4th at p. 1163, citing *In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)  We conclude substantial evidence supports the court's removal order.

Father again points to the juvenile court's finding that he had not physically abused J. and evidence that he had been

21

participating in services. He also argues that there "was no showing that Father had made any accusations of abuse against Mother—he had only defended himself against Mother's accusations to DCFS." He argues that the court again relied on the evidence of "awkward video visits" with J., which was insufficient to show detriment to J.'s well-being necessitating removal. Although the court found the evidence supporting removal from father was not as strong as that regarding mother, it nevertheless concluded that removal from both parents was necessary to protect J. We find substantial evidence supports this conclusion. Despite his claim that he was merely defending himself against mother's accusations, the record reveals multiple statements in which father continued to blame mother for J.'s injuries. The continuation of this conflict between father and mother, and both parents' lack of insight into the damage this conduct was causing to J., contributed to J.'s emotional distress and damaged J.'s continuing relationship with father. The court found this damage evident in the troublesome visits between father and J., as well as in J.'s inconsistent statements about how he was injured and whether father was "mean" or "nice." As such, substantial evidence supports the court's conclusion that both parents' continued behavior was causing emotional harm to J., which created a risk of physical harm such that removal was necessary.

"The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766.) On this record, we find that there was a sufficient evidentiary basis to remove J. from father.

**DISPOSITION**

The orders sustaining the supplemental petition under section 387 and removing J. from father's custody are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.